1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| KEYAUN STEVENSON, | ) | Civil No.07cv736-W(NLS) |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| v. | ) | **RE: PLAINTIFF'S AMENDED** |
| | ) | **MOTION FOR SUMMARY** |
| MICHAEL J. ASTRUE, Commissioner of | ) | **JUDGMENT AND DEFENDANT'S** |
| Social Security, | ) | **CROSS MOTION FOR SUMMARY** |
| Defendants. | ) | **JUDGMENT** |
| | ) | |
| | ) | [Doc. Nos. 14 & 15] |

16         Plaintiff Keyaun Stevenson brings this action pursuant to the Social Security Act, 42 U.S.C. §

17  405(g),[1] to obtain judicial review of a final decision of the Commissioner of Social Security

18  ("Commissioner") denying his application for Social Security Disability Insurance benefits under Title

19  II of the Social Security Act, 42 U.S.C. §§ 401-403.  Plaintiff has filed an Amended Motion for

20  Summary Judgment [Doc. No. 14], arguing that he should have been found "disabled" under the Act,

21  and that the Appeals Council's decision adopting the June 18, 2006 decision of the Administrative Law

22  Judge denying him benefits should be reversed because it is not supported by substantial evidence and is

23  based on legal error.  The Commissioner has filed a cross-Motion for Summary Judgment and

24  _____

25         [1] 42 U.S.C. § 405(g) provides:

26         Any individual, after any final decision of the Commissioner of Social Security made after a hearing to
           which he was a party ... may obtain a review of such decision by a civil action ... brought in the district
27         court of the United States....  The court shall have power to enter, upon the pleadings and transcript of the
           record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security,
28         with or without remanding the cause for a rehearing.  The findings of the Commissioner ... as to any fact, if
           supported by substantial evidence, shall be conclusive.

Opposition to Plaintiff's motion [Doc. Nos. 15 & 16], and Plaintiff filed a Response [Doc. No. 17]. After careful consideration of the papers, the administrative record, and the applicable law, this Court **RECOMMENDS** that Plaintiff's motion be **DENIED**, and the Commissioner's cross-motion be **GRANTED**.

<u>**PROCEDURAL HISTORY**</u>

Plaintiff applied for disability benefits on March 4, 2005. [Administrative Record ("AR") at 82-85.] Plaintiff alleged onset of disability as of October 1, 2003. [AR at 83.] He claimed to suffer from recurrent seizures. [AR at 107.] On April 20, 2005, the Commissioner determined Plaintiff was not disabled and denied his request for disability benefits. [AR at 31-35.] Plaintiff requested reconsideration of his application, and on September 15, 2005, the Commissioner denied benefits again after reconsideration. [AR at 39-43.] On November 29, 2005, Plaintiff requested an administrative hearing before an Administrative Law Judge ("ALJ") to consider his application a third time. [AR at 45.]

On May 9, 2006, the ALJ conducted a hearing to consider the merits of Plaintiff's application. [AR at 441-85.] This hearing resulted in his application being denied by the ALJ in a written decision dated June 18, 2006. [AR at 21-28.] On July 7, 2006, Plaintiff requested an Appeals Council Review of the decision. [AR at 16.] On March 22, 2007, the Appeals Council concluded there was no basis for granting Plaintiff's request for review and affirmed the ALJ's decision. [AR at 10-12.] After setting aside the March 22, 2007 denial of review and considering additional evidence submitted by Plaintiff, the Appeals Council found that the new evidence did not warrant changing the ALJ's decision, and his decision was affirmed. [AR at 5-7.] This became the final decision of the Commissioner on July 20, 2007. [AR at 5.]

Having exhausted all administrative remedies, Plaintiff initiated this action challenging the final decision of the Commissioner. (*See Plaintiff's Complaint*, Doc. No. 1.) Presiding District Judge Thomas J. Whelan referred all matters in this action to the undersigned Magistrate Judge for report and recommendation [Doc. No. 3]. On November 20, 2007, after a lengthy delay in service of the complaint, the Commissioner filed an Answer to Plaintiff's complaint, along with the Administrative Record of this matter [Doc. Nos. 10 & 11]. On January 28, 2008, Plaintiff filed his amended motion for

1   summary judgment [Doc. No. 14], requesting that the Court reverse the unfavorable decision and order

2   immediate payment of benefits due to Plaintiff's dire financial need.  On February 22, 2007, Defendant

3   filed a cross-motion for summary judgment and opposition to Plaintiff's motion [Doc. Nos. 15 & 16],

4   requesting that the Commissioner's final decision be upheld.

5   **FACTUAL BACKGROUND**

6   ### *1.   PLAINTIFF'S TESTIMONY*

7   Plaintiff was 28 years old on the date of the ALJ hearing.[2]  [AR at 83; 182.]  At the hearing,

8   having been duly sworn by the ALJ, Plaintiff testified that he had not worked since February 2005.  [AR

9   at 447.]  Prior to that date, he worked as a forklift operator and general laborer for various retail stores

10  and companies.  [AR at 445-46.]  Plaintiff testified that he first started having petit mal seizures when he

11  was twelve years old, and experienced his first grand mal seizure with convulsions on January 18, 2003.

12  [AR at 447-48.]  He explained to the ALJ that he keeps a written log of when he suffers grand mal

13  seizures, and then testified that he had a grand mal seizure on January 25, 2003, then again on February

14  7, 2003, March 11, 2003, July 19, 2003, October 25, 2003, November 1, 2004, February 18, 2005, June

15  6, 2005, November 25, 2005, December 19, 2005, January 1, 2006, February 13, 2006, and April 29,

16  2006.  [AR at 450-52.]  Plaintiff stated that he also continues to suffer from petit mal seizures, generally

17  having three per day, each lasting from thirty seconds to five minutes in length.  [AR at 454.]  He

18  described the effects of the petit mal seizures, including dizziness and spinning sensations, and a feeling

19  as though he might blackout.  [*Id*.]

20  Plaintiff further testified that he takes his prescribed anti-convulsant medication, Dilantin and

21  Trileptal, regularly, never having missed a dose.  [AR at 455.]  He stated that as the frequency of his

22  grand mal seizures increased in the first three months of 2003, the daily prescribed amount of

23  medication increased four fold.  [AR at 456.]  Plaintiff did not suffer a grand mal seizure between

24  October 2003 and November 2004.  [AR at 457.]  Plaintiff testified that he also suffers from frequent

25  headaches, having one two to three times a week, some lasting all day.  [AR at 459.]  As a result of the

26

27  [2] The Court notes that Plaintiff's memorandum in support of his motion for summary judgment erroneously states
    that he is currently forty years old.  (*Plaintiff's Memorandum*, 3.)  Based on Plaintiff's birth date, which will not be recorded
28  here to maintain Plaintiff's privacy, this is of course impossible.  The Court expects that Plaintiff's counsel will confirm the
    accuracy of such details more carefully in the future.

petit mal seizures, he also suffers from sharp head pains that last for hours, worse than a headache.  [*Id*.]

Plaintiff testified that he treats his head pain with marijuana.  [AR at 460.]  He stated that he has been

smoking marijuana since he was eighteen years old, and during the period from January 2003, the onset

of the grand mal seizures, through May 2006, when he testified, he smokes marijuana joints four times

per week.  [*Id*.]  Plaintiff testified that he had smoked a joint as recently as the day before the hearing.

[AR at 461.]  Plaintiff explained that his treating physician, Dr. Cardones, is aware of his marijuana use,

however he has only occasionally divulged the information to doctors who have treated him during his

emergency room visits.  [*Id*.]

When asked by the ALJ why he can't work, Plaintiff stated that he cannot do one particular thing

for any length of time or it brings on a petit mal seizure.  [AR at 462.]  Once he experiences a petit mal

seizure, he has head pains or a headache and he has to go home, and therefore would not be able to pass

the probationary period for most jobs without calling in sick or having to leave due to his symptoms.

[AR at 463.]  Plaintiff also stated that he is not allowed to drive, and that he generally spends his day

sleeping.  [*Id*.]  Plaintiff testified that he lives with his aunt, and on a typical day he wakes up around

9:00 a.m., washes up, and takes his first round of pills around 10:00 or 11:00 a.m.  [AR at 464.]  He

watches television for a while and then sleeps because the pills make him drowsy, along with causing

other side effects such as dizziness, confusion, double vision, stomach pains, and weakness.  [AR at

466.]  Around 3 or 4 p.m. he wakes up and watches television and then goes to sleep for the evening after

his second round of pills around 9 or 10 p.m.  [AR at 467.]  Plaintiff testified that he does not leave the

house very often, only to accompany his aunt to the store or when his cousin picks him up and takes him

to his house for a visit. [*Id*.]  Plaintiff explained how his life has changed since he suffered his first

grand mal seizure.  He used to be active, could play football, and since he started getting grand mal

seizures and had to start his medication regimen he can no longer be active.  [AR at 469.]

When questioned by his attorney, Plaintiff testified that his driver's license was suspended after

his first grand mal seizure in January 2003.  [AR at 470.]  Plaintiff stated that he has not walked farther

than the equivalent of a half of a city block since he had his first grand mal seizure.  [AR at 473.]

Plaintiff testified that he tried to continue working after developing the grand mal seizures, but he would

miss an average of five work days per month, along with having to leave work early on occasion.  [AR

07cv736

1 at 473-74.]

2 **2.      MEDICAL & VOCATIONAL EVIDENCE PRESENTED**

3            *A.      Medical Expert: Dr. Judith Willis*

4          Dr. Willis, a neurologist, testified as a medical expert at the administrative hearing.  [AR at 474-

5 81.]  Having examined Plaintiff's medical records with an onset date of January 18, 2003, she reported

6 that over the course of any six month period, Plaintiff suffers grand mal seizures at a frequency rate of

7 one per month. [AR at 474.]  Dr. Willis testified that Plaintiff's impairment does not meet or exceed

8 Listing 11.02 because his grand mal seizures do not occur frequently enough.  [*Id*.]  Dr. Willis opined

9 that Plaintiff does not suffer from petit mal seizures because his diagnostic EEG pattern was normal, not

10 evidencing the presence of petit mal seizures, and because petit mal seizures improve when the

11 individual concentrates and focuses, and Plaintiff described his as getting worse the harder he tries to

12 concentrate.  [AR at 475.]  Therefore, she concluded that Plaintiff does not meet or exceed Listing

13 11.03, petit mal seizures.  [AR at 478.]

14          Dr. Willis stated that she reviewed Plaintiff's medical records with respect to his medication,

15 which revealed Plaintiff's medication levels were subtherapeutic all but a single time he was tested.

16 [AR at 476.]  Dr. Willis hypothesized that this resulted from Plaintiff being noncompliant with his

17 prescribed medications.  [AR at 477.]  Dr. Willis explained that Plaintiff's subtherapeutic blood  levels

18 made it unlikely that his medications caused the side effects of which Plaintiff complained (i.e.,

19 headaches, double vision, stomach pains, and weakness).  [*Id*.]  Dr. Willis stated that even if Plaintiff's

20 levels were at the therapeutic level, he still would not suffer from the alleged side effects.  [AR at 478.]

21 Upon examination by Plaintiff's attorney, Dr. Willis testified that there is a one in one hundred chance

22 that Plaintiff's subtherapeutic medication levels are due to his body metabolizing the medication at a

23 higher rate than the general population.  [AR at 479.]  Dr. Willis stated that with the medication at a

24 therapeutic level, side effects such as Plaintiff claims could occur, although it is uncommon.  [AR at

25 480-81.]

26          Dr. Willis concluded that Plaintiff's residual functional capacity is limited due to his grand mal

27 seizures.  [AR at 479.]  Specifically, Dr. Willis testified that Plaintiff cannot work with machinery and

28 must avoid heights and motor vehicles.  [*Id*.]

07cv736

1

B.      *Vocational Expert: Gloria Lasoff*

2       Gloria Lasoff testified as a vocational expert at the administrative hearing.  [AR at 481-85.]

3  Having reviewed the record evidence, she reported that Plaintiff has past relevant work experience as a

4  forklift operator.  [AR at 482.]  The ALJ posed the following hypothetical to Ms. Lasoff: could Plaintiff

5  perform his former work as a forklift operator if he was limited from ropes, ladders, or scaffolds; had to

6  avoid dangerous machinery, heights, and motor vehicles.  [AR at 482.]  Ms. Lasoff responded that under

7  the terms of that hypothetical, Plaintiff could not perform his past work as a forklift operator, but

8  retained the residual functional capacity to work in other positions.  [*Id*.]  Of the 2500 medium job titles

9  in the applicable grid, Ms. Lasoff surmised that Plaintiff could perform approximately 1800, giving the

10  specific examples of laundry laborer, of which there are 2000 positions in San Diego county and over

11  400,000 nationwide; counter clerk, a light job, with 1500 positions in San Diego county and 150,000

12  nationwide; and general laborer, plastic products, assembler, of which there are 500 positions in San

13  Diego county and 70,000 nationwide.  [AR at 483-84.]  The ALJ then changed the original hypothetical

14  to include the results of Plaintiff's psychiatric and neurological test results indicating Plaintiff has no

15  psychological limitations, which Ms. Lasoff testified would not change his ability to perform the job

16  titles she had listed previously.  The ALJ changed the original hypothetical once again to include

17  Plaintiff's claimed limitations, including headaches, side effects from medication, and the period of

18  recovery from seizures.  Ms. Lasoff testified that with the limitations Plaintiff claims,  he would not be

19  able to work.  [AR at 484.]  Plaintiff's attorney also queried of Ms. Lasoff whether an individual who

20  suffered grand mal seizures at a rate of one per month requiring him to leave work for the remainder of

21  the work day would be able to sustain employment.  [AR at 484-85.]  Ms. Lasoff responded that such an

22  individual would be able to work, missing up to two days per month.  [AR at 485.]

23

C.      *Additional Background and Medical Evidence*

24       Plaintiff completed twelfth grade and attended truck driving school.  [AR at 118.]  Plaintiff

25  stopped working in December 2004 due to recurrent seizures.  [AR at 107.]  Plaintiff first sought

26  treatment for a grand mal seizure on January 18, 2003.  [AR at 209.]  He presented at Sharp Grossmont

27  Hospital's emergency room, transported by paramedics.  He was 25 years old at the time, without prior

28  chronic illnesses or a history of head injuries or prior grand mal seizures.  [*Id*.]  Plaintiff told ER staff

07cv736

that he smoked cigarettes, less than a pack per day, and drank alcohol once a week on Fridays.  He

denied any drug use, however his toxicology screen tested positive for marijuana.  [AR at 210.]  His

chest x-ray came back negative.  A non contrast CT scan revealed a small area of focal

encephalomalacia (brain tissue volume loss) in the left temporal lobe, which the radiologist opined

resulted from an old head trauma.  [AR at 211.]  The examining physician, Dr. Joseph Witkin,

concluded that Plaintiff had suffered a grand mal seizure, and that the CT finding was relevant, although

Plaintiff could not recall any specific prior head injury.  Dr. Witkin prescribed Dilantin 300 mg twice a

day (an anticonvulsant), and ordered Plaintiff to pursue follow-up care with his primary care physician

to obtain a neurology referral.  [*Id*.]

Plaintiff returned to the emergency room one week later.  He admitted using marijuana, and told

his treating nurse that he did not have a seizure, he had just gotten high.  Plaintiff left before seeing a

physician.  [AR at 206-7.]  Plaintiff sought follow-up care on January 28, 2003.  [AR at 241.]  Dr.

Arthur Cardones examined Plaintiff, diagnosed him with a seizure disorder, instructed him not to drive,

to continue with the Dilantin, and to take seizure precautions.  [*Id*.]

On February 7, 2003, Plaintiff presented at the emergency room complaining of abdominal pain,

diarrhea, dehydration, and vomiting, which he stated began after eating Chinese food.  [AR at 200, 203.]

His treating physician concluded that Plaintiff was likely suffering from food poisoning, treated Plaintiff

for those conditions, and he was released.  [AR at 197; 204.]  Plaintiff had not suffered a seizure.

On March 11, 2003, Plaintiff was transported by ambulance to the emergency room after

suffering a grand mal seizure.  Plaintiff told his treating physician that he had been noncompliant with

his Dilantin, and had not taken any medication in the previous two months.  [AR at 284.]  He was

treated and released.  [AR at 285.]  On July 19, 2003, Plaintiff was taken by ambulance to the

emergency room after suffering a grand mal seizure and falling out of bed and hitting his head.  He

informed his treating physician that he smokes cigarettes and marijuana occasionally.  [AR at 280.]

Blood tests revealed a subtherapeutic Dilantin level; a CT scan came back negative for acute bleed,

shift, or mass effect.  [AR at 281.]  He was treated and released.  [AR at 279; 282.]  On October 25,

2003, November 1, 2004, February 18, 2005, March 22, 2005, June 6, 2005, December 19, 2005,

January 1, 2006, February 13, 2006, April 29, 2006, August 7, 2006, September 23, 2006, and

1   November 10, 2006, Plaintiff suffered grand mal seizures and received treatment in the emergency room

2   where blood tests revealed subtherapeutic levels of Dilantin every time.  On all occasions, treating

3   physicians administered Dilantin on site, advised Plaintiff to continue with his prescribed Dilantin

4   regimen, and released him with instructions to seek follow up care.  [AR at 275-76, 272-73, 268-69,

5   267, 262-63, 320-21, 325-26, 373-76, 384-85, 432-34, 415-16, 412-14.]

6       Beginning in January 2003, after suffering his first grand mal seizure, Plaintiff received follow

7   up care for his seizure disorder at Grossmont Spring Valley Health Center.  [AR at 230-53.]  Dr. Arthur

8   Cardones treated Plaintiff throughout that period with Dilantin, which he stated Plaintiff took regularly.

9   [AR at 253.]  He surmised that Plaintiff suffered a grand mal seizure on average once every three

10  months.  If Plaintiff suffered a seizure at work, Dr. Cardones opined that Plaintiff's work day would be

11  interrupted and he would have to go home for the day.  Dr. Cardones thought that Plaintiff could sustain

12  a six hour work day without needing more than one five minute break every hour, and without

13  interruptions from physical symptoms, so long as he was seizure-free.  [*Id.*]

14      On April 19, 2005, Dr. Thun Do performed a residual functional capacity assessment of Plaintiff.

15  [AR at 254-61.]  Dr. Do found that Plaintiff had no established exertional limitations.  [AR at 255.]  In

16  terms of postural limitations, Dr. Do determined that Plaintiff could not climb ladders, ropes, or

17  scaffolds.  [AR at 256.]  Plaintiff suffered no manipulative, visual, or communicative limitations, but Dr.

18  Do found that he must avoid even moderate exposure to hazards such as machinery or heights.  [AR at

19  257-58.]  Dr. Do opined that Plaintiff's alleged severity and duration of symptoms were disproportionate

20  in relation to the expected severity and duration.  [AR at 259.]  Dr. Do concluded that the objective

21  evidence supported a seizure precaution residual functional capacity with no exertional limitations, but

22  stated that if Plaintiff fully complied with taking his medication as instructed, the seizure disorder would

23  be controlled.  [AR at 311.]  Dr. Do's report was reviewed and affirmed by Dr. Karolyn Mauro on

24  August 3, 2005.  [AR at 261.]

25      On August 25, 2005, Dr. Matthew Carroll performed a psychiatric evaluation of Plaintiff.  [AR

26  at 289-91.]  Dr. Carroll concluded that Plaintiff did not have any psychiatric limitations, but opined that

27  if Plaintiff suffers seizures on a daily basis, it would be very difficult for him to obtain and retain any

28  kind of job.  [AR at 291.]

1    *3.    ALJ'S FINDINGS*

2          After a discussion of the evidence in the record, the ALJ determined that Plaintiff was not

3    entitled to disability benefits.  [AR at 21-28.]  The ALJ found that the medical evidence demonstrates

4    that Plaintiff suffers from a seizure disorder, a "severe" impairment within the meaning of the

5    Regulations.  The ALJ concluded that Plaintiff's impairment is not of listing severity, however.  [AR at

6    23.]  The ALJ determined that Plaintiff could not perform his past relevant work, but he retained the

7    residual functional capacity, with compliance with prescribed treatment and with abstinence from

8    marijuana use, to perform work at all levels of exertion, with no climbing of ladders, ropes, or scaffolds;

9    no exposure to hazards or dangerous machinery; no work at unprotected heights; and no operation of

10    motor vehicles.  [AR at 24, 27.]  Specifically, the ALJ determined that Plaintiff's ability to perform

11    work at all levels of exertion is compromised by his nonexertional limitations.  [AR at 27.]  Based on the

12    testimony of the vocational expert present at the administrative hearing, the ALJ concluded that Plaintiff

13    was capable of making a successful adjustment to other work that exists in significant numbers in the

14    national economy, including laundry laborer, counter clerk, and general laborer, plastic products,

15    assembler.  [AR at 28.]

16          In determining that Plaintiff's seizure disorder did not meet or medically equal a listed

17    impairment, the ALJ affixed great weight to the testimony of medical expert and neurologist, Dr. Willis.

18    [AR at 24.]  Dr. Willis testified that the objective medical evidence in the record indicates Plaintiff is

19    noncompliant with his medication, and Plaintiff's admitted use of marijuana and/or alcohol is a

20    contributing factor material to the disability determination, since such usage renders his medication less

21    effective.  [AR at 25.]  The ALJ found Plaintiff's claimed limitations, particularly his allegations of

22    medication side effects, not entirely credible in relation to the objective medical evidence.  [AR at 26-

23    27.]  Accordingly, the ALJ denied Plaintiff's claim for benefits.  [AR at 28.]

24    **DISCUSSION**

25    *1.    LEGAL STANDARD*

26          The Social Security Act authorizes payment of benefits to individuals who have an "inability to

27    engage in any substantial gainful activity by reason of any medically determinable physical or mental

28    impairment which can be expected to result in death or which has lasted or can be expected to last for a

07cv736

1  continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The disabling impairment

2  must be so severe that the claimant is not only unable to do his previous work, but, considering age,

3  education, and work experience, cannot engage in any kind of substantial gainful work that exists in the

4  national economy. *Id*. § 1382c(a)(3)(B).

5       The Commissioner makes this assessment using a five-step analysis. First, the Commissioner

6  determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not

7  disabled. *See* 20 C.F.R. § 416.920(b). Second, the Commissioner determines whether the claimant has

8  a "severe impairment or combination of impairments" that significantly limits the claimant's physical or

9  mental ability to do basic work activities. If not, the claimant is not disabled. *Id.* § 416.920(c). Third,

10  the medical evidence of the claimant's impairment is compared to a list of impairments that are

11  presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed

12  impairments, benefits are awarded. *Id.* § 416.920(d). Fourth, if the impairment meets or equals one of

13  the listed impairments, the Commissioner determines whether the claimant can do his past relevant

14  work. If the claimant can do his past work, benefits are denied. *Id*. § 416.920(e). If the claimant cannot

15  perform his past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner

16  must establish that the claimant can perform other work. *Id*. § 416.920(f). If the Commissioner meets

17  this burden and proves that the claimant is able to perform other work that exists in the national

18  economy, then benefits are denied. *Id*. § 416.966.

19       Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review

20  of a final agency decision of the Commissioner. 42 U.S.C. §§ 405(g). The scope of judicial review is

21  limited, however, and the Commissioner's denial of benefits "will be disturbed only if it is not supported

22  by substantial evidence or is based on legal error." *Brawner v. Sec'y of Health & Human Servs.*, 839

23  F.2d 432, 433 (9th Cir. 1988) (*citing Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)).

24       Substantial evidence means "more than a mere scintilla" but less than a preponderance.

25  *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997). "[I]t is such relevant evidence as a reasonable

26  mind might accept as adequate to support a conclusion." *Id.* (*quoting Andrews v. Shalala*, 53 F.3d 1035,

27  1039 (9th Cir. 1995)). The court must consider the record as a whole, weighing both the evidence that

28  supports and detracts from the Commissioner's conclusions. *Desrosiers v. Sec'y of Health & Human*

07cv736

1    *Servs.*, 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation,

2    the court must uphold the ALJ's decision.  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  When

3    the evidence is inconclusive, "questions of credibility and resolution of conflicts in the testimony are

4    functions solely of the Secretary."  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

5          Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the

6    court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the

7    evidence and reaching his or her decision.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

8    Section 405(g) permits a court to enter a judgment affirming, modifying, or reversing the

9    Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the matter to the

10   Commissioner for further proceedings.  *Id.*

11         ***2.    PLAINTIFF'S CLAIMS***

12   *A.    Whether the ALJ Erred by Failing to Determine that Plaintiff's Headaches Constitute a Severe*

13   *Impairment*

14         Plaintiff claims that the ALJ erred at Step Two in the sequential evaluation process by failing to

15   find that his headaches constitute a severe impairment supported by substantial evidence in the record.

16   (*Plaintiff's Memorandum*, 3-5.)

17         At Step Two in the sequential evaluation, the ALJ considers if a claimant has "an impairment or

18   combination of impairments which significantly limits his physical or mental ability to do basic work

19   activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).  This is referred to as the "severity" requirement and

20   does not involve consideration of the claimant's age, education, or work experience.  *Id.*  The step-two

21   inquiry is a *de minimis* screening device to dispose of groundless claims.  *Bowen v. Yuckert*, 482 U.S.

22   153-54 (1987).  The ALJ must "consider the combined effect of all of the individual's impairments

23   without regard to whether any such impairment, if considered separately, would be of [sufficient

24   medical] severity." 42 U.S.C. § 1382c (a)(3)(F).  A claimant has the burden to produce sufficient

25   evidence that he or she actually suffers from an impairment, or else it need not be factored into a

26   disability analysis.  *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).  A mental or physical impairment

27   is a basis for disability where it is medically determinable, that is, it results from anatomical,

28   physiological, or psychological abnormalities which can be shown by medically acceptable clinical and

1   laboratory diagnostic techniques and established by medical evidence consisting of signs, symptoms,

2   and laboratory findings, as distinct from a statement of symptoms.  20 C.F.R. §§ 404.1505(a), 404.1508,

3   416.905(a), 416.908.

4          In support of this allegation of error, Plaintiff refers to various portions of the administrative

5   record.  First, he relies on written responses to a questionnaire given to his treating physician, Dr.

6   Cardones, wherein Dr. Cardones confirmed that Plaintiff suffers from headaches.  [AR at 398.]  Plaintiff

7   also points out multiple portions of the administrative hearing transcript documenting his testimony

8   regarding his headaches and their significant impact on his ability to obtain substantial gainful

9   employment; his responses to a seizure questionnaire where he indicated that he cannot resume normal

10  daily activities for two to three days following a seizure due to the headaches that result; the statement

11  of his friend describing the negative impact of his headaches on Plaintiff's life; and emergency room

12  records which document his statements of post-seizure headaches upon admission.  (*Plaintiff's*

13  *Memorandum*, 5, *citing relevant pages of Administrative Record*.)

14         The Commissioner argues in opposition that the ALJ was not required to consider the severity of

15  Plaintiff's headaches because the record of the case does not support the existence of a headache

16  disorder as an impairment separate and apart from seizure disorder.  (*Commissioner's Memorandum*, 5.)

17  The Commissioner asserts that Dr. Cardones' questionnaire responses, relied upon by Plaintiff to

18  support his claim of severe headaches, constitute an "after-the-fact opinion that was obtained by

19  Plaintiff's counsel after Plaintiff's hearing, which diminishes its reliability."  (*Id*. at 6, *citing Saelle v.*

20  *Chater*, 94 F.3d 520, 522-23 (9th Cir. 1995) (physician's opinion properly rejected because it was

21  solicited by claimant's attorney and not based on objective medical evidence).)  The Commissioner

22  argues that Plaintiff's noncompliance with his medication regimen resulted in poorly controlled

23  seizures, and therefore led to headaches following the seizures, which could have been avoided

24  otherwise.  (*Id.* at 6.)

25         Plaintiff did not include headaches as an impairment through the process of his claim - his only

26  claimed impairment is recurrent seizures.  [AR at 107.]  The substantial evidence to which Plaintiff

27  refers in support of this claim consists solely of symptom statements.  His testimony at the

28  administrative hearing, cited in pertinent part below, demonstrates that the headaches of which he

complains are symptomatic of his seizures and not a formally diagnosed condition.  Plaintiff testified as follows:

ALJ:    Tell me about your headaches.  How often do you get headaches?

P:      It depends.  Like, a petit seizure can turn into a big headache.  That's not even – I wouldn't even –

ALJ:    Well, how often do you get headaches, whether it's from a petit seizure or without one?

P:      Okay.  Well, I headache, I can get headaches like two to three times a week.  But the headaches after the petit seizures, those are worser than headaches.  I call them head pains.  I prefer to use that word.

ALJ:    Well, how long do they last?

P:      They can last all day.  After I have a petit seizure – sometime I can have a petit seizure, and a petit seizure lasts like a minute or however long it lasts, and it'll go away.  I get my mind back, you know.  Or sometime a petit seizure can just turn into that head pain, and that can last for hours.

ALJ:    So what happens when you get the head pain? How do you treat that?

P:      It lasts hours.

ALJ:    How do you treat it?

P:      There's basically no way to treat it.

ALJ:    You don't take any medication?

P:      Well, to be honest, I smoke marijuana.  That's what I do for that pain.  When that pain comes, that's about the only thing I know to –

[AR at 459-60.]  The colloquy then turned to the issue of Plaintiff's self-medicating marijuana use.

The portion of the medical records cited by Plaintiff that pertain to his headaches are emergency room admission notes, where it is documented that after each of his grand mal seizures Plaintiff complained of having a headache; however, these records do not indicate a diagnosis of severe debilitating headaches or any treatment for the headaches specifically, as opposed to treatment for the seizures.  Dr. Cardones' treating notes, appearing multiple times in the medical record, document that Plaintiff's only confirmed diagnosis is a seizure disorder, and Plaintiff's headaches complaints are symptomatic.  Plaintiff's responses to the seizure questionnaire are again symptom statements.  Plaintiff does not provide the necessary medical evidence, nor does the record of the case contain such evidence, to support a finding that he suffers a severe impairment of debilitating headaches.

1    To establish a severe impairment, a claimant must offer more than just symptom descriptions.

2    Here, Plaintiff has not provided signs, findings, or any physician's opinion that he suffers from the

3    medically determinable impairment of debilitating headaches.  He has presented evidence only of

4    headaches symptomatic of his seizure disorder.  The ALJ therefore did not commit error by failing to

5    find that Plaintiff's headaches constitute a severe medical impairment.  *Accord, Celaya v. Halter*, 332

6    F.3d 1177, 1181 (9th Cir. 2003)(holding in part that headaches attributable to high blood pressure,

7    another impairment considered by the ALJ, were not an independent condition requiring separate

8    factoring into the analysis of impairments).

9    B.    Whether the ALJ Improperly Rejected Plaintiff's Testimony of Disabling Medication Side
10         Effects

11   Plaintiff claims that the ALJ erred by rejecting his testimony regarding his medication side

12   effects.  (*Plaintiff's Memorandum*, 5-11.)  Plaintiff argues that substantial evidence in the medical

13   record supports his testimony, and the ALJ's reasons for rejecting his testimony are not clear and

14   convincing.  The Commissioner asserts that Plaintiff's credibility was placed in doubt by his admission

15   to using marijuana at his hearing, and his prior inconsistent statements to his treating physicians

16   regarding his drug use.  (*Id*. at 5.)  The Commissioner also argues that contemporaneous treatment

17   records do not support Plaintiff's complaints of medication side effects, and Plaintiff's testimony is

18   further discredited by his noncompliance with prescribed treatment.  (*Id*. at 7.)

19   In deciding whether to credit a claimant's testimony about subjective symptoms or limitations,

20   the ALJ must engage in a two-step analysis.  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).

21   First, the claimant must produce objective medical evidence of an underlying impairment that could

22   reasonably be expected to produce pain or other symptoms.  *Id*. at 1281.  If this test is satisfied, and

23   there is no affirmative evidence that the claimant is malingering, then the ALJ must determine the

24   credibility of the claimant's subjective complaints.  In assessing the credibility of the claimant's

25   subjective complaints, the ALJ may consider such factors as the claimant's reputation for truthfulness,

26   any inconsistencies in the claimant's statements, and the claimant's daily activities.  *Smolen*, 80 F.3d at

27   1284; 20 C.F.R. §§ 404.1529, 416.929; S.S.R. 96-7p.  The ALJ may reject the claimant's testimony

28   about the severity of symptoms as long as he gives specific, convincing reasons for doing so.  *Id*.

Here, Plaintiff offered objective medical evidence that he suffers from a seizure disorder, and there is no affirmative evidence to suggest that he is malingering.  Accordingly, the ALJ was required to evaluate the credibility of Plaintiff's testimony regarding his symptoms, limitations, and medication side effects.  The ALJ considered Plaintiff's subjective complaints and determined that, in light of the record, they were not entirely credible.  [AR at 27.]  In making this determination, the ALJ relied on the testimony of the medical expert that Plaintiff's complaints of medication side effects could not be explained by the medical records documenting his treatment for the seizures:

> "Dr. Willis found no objective basis in the record to credit the claimant's allegations of medication side effects.  The medical expert opined that the claimant's alleged side effects are not generally seen in the patient population, based on her practice and knowledge; Dr. Willis testified that her medical practice includes treatment of seizure disorders.  Indeed, Dr. Willis noted that, given the claimant's subtherapeutic medication levels, the claimant's alleged side effects are extremely unlikely."

[AR at 25.]  The ALJ went on to conclude:

> "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting side effects of these symptoms are not entirely credible.  No physician of record has opined that the claimant's impairments are more severe or functionally limiting than I find."

[AR at 26-27.]  When the ALJ makes specific findings for discounting the claimant's testimony, and such findings are supported by substantial evidence in the record, the Court's role is "not to second-guess that decision."  *Fair*, 882 F.2d at 604.  The Court finds that the ALJ's credibility determination was based on substantial evidence in the record which demonstrated repeatedly that Plaintiff's medication levels were subtherapeutic for almost the entire claimed period of disability, and therefore it is extremely unlikely that he suffers side effects to the extent he claims.

The Court also finds that Dr. Cardones' questionnaire responses do not constitute new material evidence on this issue, as Plaintiff argues.  (*Plaintiff's Memorandum*, 8.)  Section 405(g) instructs that new evidence has to be material, and good cause must exist for the failure to incorporate such evidence into the record in a prior proceeding...."  42 U.S.C. § 405(g); *Booz v. Secretary of Health & Human Services*, 734 F.2d 1378, 1381 (9th Cir. 1984).  The Ninth Circuit has held that for new evidence to be considered material, a claimant needs to show that there is a reasonable possibility that the evidence would have changed the outcome of the case.  *Id.*; *see also*, *King v. Bowen*, 852 F.2d 1289 (9th Cir.

1   1988).  In addition, the new evidence must bear directly and substantially on the matter in dispute.

2   *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001) (quotations and citations omitted).

3           First, Plaintiff has not demonstrated good cause for failing to offer the questionnaire responses

4   earlier.  A claimant does not meet the good cause requirement by merely obtaining a more favorable

5   report once his or her claim has been denied.  To show good cause, the claimant must demonstrate that

6   the new evidence was unavailable earlier.  *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) ( "If

7   new information surfaces after the Secretary's final decision and the claimant could not have obtained

8   that evidence at the time of the administrative proceeding, the good cause requirement is satisfied"); *see*

9   *also Sanchez v. Secretary of Health & Human Servs.*, 812 F.2d 509, 512 (9th Cir. 1987) (holding that

10  the claimant lacked good cause to remand for consideration of two psychological examinations prepared

11  after the claimant's disability determination when his attorney failed to explain why the evidence had

12  not been available earlier).  The claimant must also establish good cause for not having sought an expert

13  or treating physician's opinion earlier.  *Clem v. Sullivan*, 894 F.2d 328, 332 (9th Cir. 1990).

14          Plaintiff's sole explanation as to why he did not seek or could not have presented the

15  questionnaire to Dr. Cardones before the ALJ Hearing is that his attorney "was perplexed by the

16  testimony of the medical expert" at the hearing and went to Dr. Cardones for clarification regarding

17  Plaintiff's allegations of medication side effects.  (*Plaintiff's Memorandum*, 9.)  The medical expert

18  gave straightforward testimony that, given Plaintiff's repeated subtherapeutic levels of medication, it

19  was unlikely that he suffered from the side effects he alleged.  [AR at 477-78.]  The suggestion that

20  Plaintiff's counsel found this testimony perplexing is disingenuous considering the level of detail that

21  counsel covered when questioning the medical expert on the subject during the hearing.  [AR at 479-81.]

22          Plaintiff fails to meet the "good cause" requirement, therefore the question as to whether the new

23  evidence is material is moot.  However, even if Plaintiff demonstrated good cause for not presenting the

24  evidence earlier, Plaintiff has not shown that Dr. Cardones' questionnaire responses constitute material

25  evidence, such that had they been before the ALJ, he would have found Plaintiff disabled.  The

26  information contained in the completed questionnaire reiterates information that was before the ALJ at

27  the time of the hearing, i.e. the medications Plaintiff takes, their possible side effects, side effects

28  Plaintiff claims to experience, the possible impact of toxicity, the effect of metabolism, and the

07cv736

1  effectiveness of the medicine with compliance.  [AR at 398-99.]  All of these issues were discussed at

2  the hearing during the ALJ's colloquy with the medical expert and Plaintiff's counsel's colloquy with

3  the medical expert.  [AR at 476-81.]  There is not a reasonable possibility that Dr. Cardones'

4  questionnaire responses would have changed the outcome of this case.

5         Finally, Plaintiff argues that the ALJ's hypothetical questions to the vocational expert did not

6  include any limitations due to Plaintiff's alleged medication side effects.  (*Plaintiff's Memorandum*, 12.)

7  This is clearly not the case, as the hearing transcript reflects that the fourth hypothetical given by the

8  ALJ to the vocational expert did include Plaintiff's claimed limitations, specifically headaches,

9  medication side effects, and the period of recovery needed after petit mal seizures.  [AR at 484.]

10

11  *C.*    *Whether the ALJ Failed to Resolve Conflicts in the Record*

12         Plaintiff claims that the ALJ's decision in this case failed to resolve three conflicts in the record,

13  including 1) whether Plaintiff suffers petit mal seizures; 2) whether Plaintiff is compliant with his

14  medications; and 3) whether Plaintiff's marijuana use impacts the effectiveness of his medications.

15  (*Plaintiff's Memorandum*, 14-18.)  The Commissioner argues that no conflicts exist in the record that

16  would support remand or reversal of the case.  (*Commissioner's Memorandum*, 7.)

17         The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

18  medical evidence.  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence

19  in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the

20  functions of the ALJ.  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the

21  ALJ's conclusion must be upheld."  *Morgan v. Commissioner of the Social Security Administration*, 169

22  F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are

23  material (or are in fact inconsistencies at all) . . . falls within this responsibility."  *Id.* at 603.  In

24  resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by

25  specific, cogent reasons."  *Reddick*, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and

26  thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and

27  making findings."  *Id.*  The ALJ also may draw inferences "logically flowing from the evidence."

28  *Sample*, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the

07cv736

1   ALJ's opinion." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

2       First, Plaintiff claims the ALJ erred in relying on the medical expert's opinion that Plaintiff does

3   not suffer from petit mal seizures and rejecting Plaintiff's testimony of daily seizures. (*Plaintiff's*

4   *Memorandum*, 14-15.)  The ALJ did find, however, that Plaintiff had the impairment of a recurrent

5   seizure disorder that causes mild to moderate limitations in his ability to work. [AR at 23.]  In doing so,

6   the ALJ discounted Plaintiff's subjective complaints regarding limitations caused by his daily seizures.

7   Plaintiff argues he is more limited due to these seizures than found by the ALJ. (*Plaintiff's*

8   *Memorandum*, 15.)

9       Once there is evidence of a medically determinable impairment likely to cause alleged

10  symptoms, the ALJ must provide specific and cogent reasons for rejecting a claimant's subjective

11  complaints.  *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).  When an ALJ finds the claimant's

12  testimony as to the severity of symptoms is unreliable, the ALJ must make a credibility determination

13  with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit

14  claimant's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958-959 (9th Cir. 2002).  Further, where

15  medical evidence of an impairment is presented, the lack of objective medical evidence to corroborate

16  severity is only one factor considered by the Commissioner. *Bunnell*, 947 F.3d at 345.  In addition to

17  the "ordinary techniques of credibility evaluation," the following factors also may be considered: (1) the

18  claimant's reputation for truthfulness; (2) inconsistencies in the claimant's testimony or between his

19  testimony and his conduct; (3) claimant's daily living activities; (4) claimant's work record; and (5)

20  testimony from physicians or third parties concerning the nature, severity, and effect of claimant's

21  condition. *Id.*; *see also Thomas*, 278 F.3d at 958.  The ALJ "must specifically identify the testimony she

22  or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v.*

23  *Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) (citation omitted).

24      The ALJ adhered to this legal standard.  The ALJ found that medical evidence established a

25  seizure disorder that could reasonably be expected to cause some of Plaintiff's subjective symptoms,

26  and made detailed credibility findings pursuant to SSR 96-7p. [AR at 24-25.]  The ALJ considered the

27  medical expert's testimony, as well as supporting medical evidence in the record, and articulated

28  specific reasons for rejecting Plaintiff's complaints.  For instance, the ALJ noted that Plaintiff made

07cv736

1  inconsistent statements as to the frequency of his seizures and his statements regarding use of marijuana
2  and alcohol.  [AR at 27.]  The ALJ referenced Plaintiff's negative electroencephalogram, indicating the
3  absence of petit mal seizures.  [AR at 24.]  The ALJ also considered Plaintiff's statement that focus and
4  conscious effort make his petit mal seizures worse, and rejected it based on objective medical evidence
5  that petit mal seizures actually improve with focus and conscious effort.  [AR at 24.]  Finally, the ALJ
6  noted that despite Plaintiff's testimony about his medication compliance, the weight of the medical
7  evidence in the record contradicted his assertion of compliance.  [AR at 25.]  Based on all these reasons,
8  the ALJ appropriately determined that Plaintiff  lacked credibility and properly rejected his testimony.

9       Plaintiff also argues that new, material evidence bears directly on this issue, and therefore
10  remand is necessary.  (*Plaintiff's Memorandum*, 15-16.)  Plaintiff refers to a letter composed by Michael
11  Flink, D.O., Ph.D., with the Department of Neurology at the University of California, San Diego.  [AR
12  at 400.]  The letter is not dated, but was submitted into the record after Plaintiff's administrative hearing.
13  Flink opines in the letter that based on Plaintiff's "descriptions of his seizures and prior records, it
14  appears that he actually experiences complex partial seizures with occasional secondary generalization."
15  [*Id.*]  He goes on to state that these types of seizures are similar to petit mal seizures, if experienced
16  frequently they may interfere with Plaintiff's ability to work, and Plaintiff should not drive.  [*Id.*]
17  Plaintiff argues that Flink's letter provides further proof that the ALJ failed to resolve conflicting record
18  evidence regarding whether Plaintiff suffers petit mal seizures, and for this reason the letter is material
19  evidence.  The Court disagrees with Plaintiff's assertion that Flink's letter relates to this issue.  The
20  letter plainly states that Plaintiff  doesn't suffer from petit mal seizures.  Therefore, the letter confirms
21  the ALJ's findings rather than presenting evidence of a conflict in the record.  In addition, the letter is
22  not material, as a reasonable possibility does not exist that it would have changed the outcome of
23  Plaintiff's case if considered by the ALJ.  *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001).  Flink
24  offers an opinion based solely upon Plaintiff's own subjective complaints, which the ALJ rejected for
25  the reasons stated above.

26       Plaintiff also argues that Flink's response to a single inquiry post-administrative hearing
27  questionnaire contradicts the medical expert's testimony at the hearing regarding the effect of Plaintiff's
28  marijuana use on the effectiveness of his seizure medication.  (*Plaintiff's Memorandum*, 18.)  On June

07cv736

1   16, 2006, in response to the question of whether marijuana use would counteract the effects of

2   Phenytoin (generic name for Dilantin), Flink stated that he is "currently unaware of controlled studies

3   that support or disprove an interaction between marijuana and Dilantin.  However, I discourage the

4   combination anyway." [AR at 393.]  Plaintiff claims that this response contradicts the medical expert's

5   testimony that marijuana use reduces the effectiveness of seizure medications, and complains that the

6   medical expert provided no evidentiary support for her opinion.  (*Plaintiff's Memorandum*, 18.)  Again,

7   as stated above, the Court disagrees with Plaintiff's claim that the Flink questionnaire response conflicts

8   with the record.  Flink did not disagree with the medical expert's opinion; his statement directly

9   supports the medical expert's testimony, as well as the ALJ's determination, that Plaintiff's marijuana

10  use negatively impacted the effectiveness of his seizure medication.  Flink, like the medical expert,

11  advises against marijuana use by a patient taking Dilantin, and acknowledges that he makes this

12  conclusion despite an absence of controlled studies which support the opinion medically.  [AR at 393.]

13  The evidence is not material to the issue; there is no reasonable possibility that Flink's statement would

14  have changed the outcome of the case.

15          Finally, Plaintiff claims that the ALJ failed to resolve whether Plaintiff is noncompliant with his

16  seizure medications.  Plaintiff argues that the ALJ erred by relying on the medical expert's opinion, and

17  once again argues that Dr. Cardones' questionnaire responses submitted into the record after the

18  administrative hearing constitute new, material evidence of a conflict in the record on this issue.

19  (*Plaintiff's Memorandum*, 16-17.)

20          The ALJ adhered to the appropriate legal standard and found that medical evidence established

21  Plaintiff's noncompliance with his medication regimen.  The ALJ considered the medical expert's

22  testimony, as well as supporting objective medical evidence in the record, and articulated specific

23  reasons for his determination.  For instance, the ALJ noted that multiple portions of the medical record

24  demonstrate that Plaintiff's Dilantin levels repeatedly tested at subtherapeutic levels.  [AR at 25.]  The

25  ALJ referenced the medical expert's opinion that the subtherapeutic levels are secondary to

26  noncompliance based on the 1% possibility that Plaintiff metabolizes his medications more quickly than

27  the rest of the general population.  [*Id.*]  The ALJ also relied on treating records, wherein Dr. Cardones

28  noted Plaintiff's noncompliance.  [*Id.*]

07cv736

1    To the extent that Plaintiff argues Dr. Cardones' subsequent questionnaire responses should be

2    considered new, material evidence bearing on this issue, for the reasons stated previously, the

3    questionnaire responses do not qualify as material evidence. The pertinent portion of the questionnaire

4    consists of Dr. Cardones responding that a hypothetical patient's digestion or metabolism could possibly

5    result in seizures despite medication compliance, and that a hypothetical patient could be compliant with

6    medication and possibly continue to have seizures. [AR at 399.] Even if Plaintiff had demonstrated the

7    materiality of Dr. Cardones' responses, they do not bear on this issue. They are not inconsistent with his

8    notes contained in the medical record, as his musings on the impact of medication noncompliance in a

9    hypothetical patient have no relation to his treatment and observation of Plaintiff.

10   D.    *Whether the ALJ Erred at Step Three in the Sequential Evaluation Process*

11         Plaintiff claims that the ALJ erred in finding that Plaintiff's seizure disorder does not meet

12   Listing 11.02 (grand mal seizures), and failed to evaluate whether Plaintiff's seizure disorder, when

13   considered with Plaintiff's other claimed impairments (headaches and medication side effects) equals

14   Listing 11.02.[3] (*Plaintiff's Memorandum*, 18-20.) Plaintiff does not dispute the ALJ's finding that his

15   seizure disorder does not meet or equal listing 11.03 (petit mal seizures). The Commissioner argues that

16   the ALJ's equivalence determination was based on evidence in the record that Plaintiff is noncompliant

17   with his prescribed treatment, and was not erroneous. (*Commissioner's Memorandum*, 9.)

18         At step three of the sequential disability evaluation process, the ALJ must evaluate the

19   claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404,

20   Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098

21   (9th Cir. 1999). If any of the claimant's impairments meet or equal a listed impairment, he or she is

22   deemed disabled. *Id.* The burden of proof is on the claimant to establish he or she meets or equals any

23   of the impairments in the Listings. *Tacket*, 180 F.3d at 1098. An ALJ must evaluate the relevant

24   evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A

25   "boilerplate" finding is insufficient to support a conclusion that a claimant's impairment does not do so.

26

27   [3] 11.02: Epilepsy-major motor seizures, (grand mal or psychomotor), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in

28   spite of at least 3 months of prescribed treatment. With: A. Daytime episodes (loss of consciousness and convulsive seizures) or B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

07cv736

1   *See Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990).

2          In his written decision, the ALJ concluded that Plaintiff's impairment (recurrent seizures) did not

3   meet or equal a listed impairment:

4          "[C]onsidering the nature, severity, frequency, duration, and persistence of the claimant's
           reported seizures; the type, dosage, and effectiveness of medications; the serum levels of the
5          claimant's prescribed medications; and the effects of the claimant's marijuana use, the
           medical expert concluded, and I concur, that the listings are not satisfied and that the
6          claimant remains capable of performing work activities within the above parameters.
           Indeed, the state agency also concluded that the claimant's impairments are not of listing
7          level and that the claimant merely requires seizure precautions.

8          The record supports the conclusions of the medical expert and state agency. The regulations
           at 20 C.F.R. part 404, subpart P, Appendix 1, section 11.00, indicate that listing criteria may
9          be applied only if the claimant's seizure disorder persists despite the fact that he is following
           prescribed treatment. In this case, however, Dr. Willis noted and the record shows (*e.g.*,
10         Exhibits 4F, 6F, 12F), that the claimant's Dilantin levels have repeatedly tested at sub-
           therapeutic levels."

11

12  [AR at 24-25.]

13         The ALJ made specific findings as to the nature and extent of each type of seizure noted in

14  Plaintiff's medical records. He also made findings as to the average frequency of Plaintiff's grand mal

15  seizures. [AR at 25-26.] In addition, the ALJ found that Plaintiff's seizures were largely a result of

16  noncompliance with his prescribed treatment. [AR at 27.] This finding is consistent with the

17  corresponding regulation, which states that a claimant's impairment does not meet the epilepsy listing

18  unless it "persists despite the fact that the individual is following prescribed anticonvulsive treatment."

19  20 C.F.R. Pt. 404 , Subpt. P, App. 1, § 11.00A.

20         In addition, the regulation advises that an ALJ can ordinarily determine whether a claimant is

21  adhering to his or her prescribed therapy from objective clinical findings in the treating physician's

22  report. *Id.* An ALJ cannot allow a claim under the epilepsy listing without a record of anticonvulsant

23  blood levels. SSR 87-6. The ALJ must evaluate blood drug levels along with all other evidence to

24  determine the extent of the claimant's compliance with treatment. 20 C.F.R. Pt. 404 , Subpt. P, App. 1,

25  § 11.00A. The ALJ determined from the medical evidence that Plaintiff's Dilantin levels consistently

26  tested in the subtherapeutic range, and concluded that Plaintiff's failure to comply with his medication

27  regimen resulted in the low blood levels. [AR at 25.] The ALJ detailed at length the repeated evidence

28  that Plaintiff did not comply with his prescribed treatment. [AR at 26.]

1    The ALJ also noted other evidence of noncompliance.  At various times throughout the record,

2    Plaintiff's blood tested positive for marijuana, and Plaintiff intermittently told his treating emergency

3    room physicians and his primary care physician that he used alcohol and marijuana.  [AR at 25.]

4    Plaintiff himself testified at the administrative hearing that he uses marijuana up to four times per week.

5    [AR at 460-61.]  The medical expert testified, and the ALJ concurred, that Plaintiff's marijuana use

6    aggravated his seizure disorder, and was potentially a contributing factor to his noncompliance.  [AR at

7    25.]  In assessing Plaintiff's residual functional capacity, Dr. Do opined that with full medication

8    compliance Plaintiff's seizure disorder would be well controlled.  [AR at 311.]  The ALJ noted and

9    concurred with this finding. [AR at 27.]  In sum, the ALJ found, with adequate explanation and record

10   support, that Plaintiff does not consistently comply with his medication regimen, and therefore his

11   seizure disorder did not meet Listing 11.02.

12       Based on these findings, the ALJ also determined that Plaintiff's seizure disorder did not

13   medically equal Listing 11.02.  The ALJ did not discuss any combined effects, or compare them to the

14   listing, as Plaintiff's only claimed impairment was his seizure disorder.  Therefore, Plaintiff's assertion

15   that the ALJ erred by failing to consider the combined effect of his seizures with his headaches and

16   medication side effects is without merit, as these complaints were alleged limitations symptomatic of his

17   seizure disorder, not claimed impairments.  "Symptoms alone" will not justify a finding of equivalence.

18   20 C.F.R. § 404.1508.  In any event, Plaintiff offers no theory, plausible or otherwise, as to how his

19   seizure disorder and headaches and medication side effects combined to equal Listing 11.02.  Moreover,

20   nothing in the regulations allows for a claimant to circumvent the compliance requirement of the

21   epilepsy listings by "equaling" rather than "meeting" the listing.  As such, the ALJ did not err in

22   concluding that Plaintiff's conditions did not equal Listing 11.02.

23   D.    *Whether the ALJ's Refusal to Reopen Plaintiff's Prior Claim Violated Due Process*

24       Plaintiff claims the ALJ denied his due process rights by denying him an opportunity to be heard

25   on his request to reopen a prior application denial.  (*Plaintiff's Memorandum*, 21.)  The Commissioner

26   argues that Plaintiff has not raised a colorable constitutional claim that would vest this Court with

27   jurisdiction to consider the issue.  (*Commissioner's Memorandum*, 9.)

28       The Social Security Act limits judicial review to "final decision[s] of the Commissioner made

07cv736

1    after a hearing." 42 U.S.C. §§ 405(g), (h). The Supreme Court has held that section 405(g) does not

2    afford subject matter jurisdiction over denials by the Commissioner of requests to reopen prior

3    applications because such decisions are not made after a mandated hearing, and hence such

4    determinations are not subject to judicial review under this jurisdictional provision of the Act. *Califano*

5    *v. Sanders*, 430 U.S. 99, 108 (1977). The *Califano* court recognized the need for a limited exception to

6    this general rule. Jurisdiction necessarily is to be permitted, the court said, in those "rare instances"

7    involving "colorable constitutional issues." *Id.* at 109.

8            Plaintiff alleges that the ALJ denied his due process rights by denying him an opportunity to be

9    heard on his request to reopen his prior application. (*Plaintiff's Memorandum*, 21.) Specifically,

10   Plaintiff refers to evidence in the record that was submitted after the administrative hearing. (*Id.*, citing

11   AR at 398-400, Dr. Cardones' questionnaire responses, presumably as an example.) Plaintiff also

12   claims that the ALJ's statement of his determination not to reopen Plaintiff's prior application is

13   conclusory and inadequate. (*Id.*) The Court notes that Plaintiff cites no relevant case law to support his

14   assertion that the ALJ's decision violated due process.

15           Plaintiff's allegation of a due process violation is without merit. Subsequent to his notice of the

16   ALJ's unfavorable determination, Plaintiff requested an Appeals Council Review of the decision. [AR

17   at 16.] On March 22, 2007, the Appeals Council concluded there was no basis for granting Plaintiff's

18   request for review and affirmed the ALJ's decision. [AR at 10-12.] The Appeals Council then chose to

19   set aside the March 22, 2007 denial of review in order to consider new evidence submitted by Plaintiff.

20   [AR at 5.] This evidence included the questionnaire responses from Dr. Cardones and Michael Flink,

21   Flink's letter, as well as medical records generated after Plaintiff's administrative hearing. [AR at 8.]

22   The Appeals Council considered the new evidence, and found that it did not warrant a change to the

23   ALJ's decision, including his decision not to reopen Plaintiff's prior application. [AR at 5-7.] This

24   became the final decision of the Commissioner on July 20, 2007. [AR at 5.] Plaintiff received all the

25   process he was due; he was not denied an opportunity to be heard, in so far as his new evidence was

26   accepted into the record by the Appeals Council, duly considered, and determined to provide no basis

27   for altering any of the ALJ's findings. Therefore, Plaintiff fails to raise a colorable constitutional claim,

28   and this Court lacks jurisdiction to review the Appeals Council's refusal to reopen his prior benefits

1  application. *Rolen v. Barnhart*, 273 F.3d 1189, 1191 (9th Cir. 2001).

2

3  E.      *Whether the ALJ Erred by Failing to Inquire on the Record Whether the Vocational Expert's Testimony Conflicted With the Dictionary of Occupational Titles*

4

5      Plaintiff's final allegation of error involves the ALJ's Step Five determination that Plaintiff is

6  capable of performing jobs available in the national and local economy.  Plaintiff argues that the ALJ

7  erred by basing this decision on testimony elicited from the vocational expert, without inquiring whether

8  the her testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (*Plaintiff's*

9  *Memorandum*, 21-23.)  The Commissioner essentially concedes that the ALJ so erred, but contends that

10  the ALJ's error was harmless because there was no conflict between the vocational expert's testimony

11  and the Dictionary of Occupational Titles.  (*Commissioner's Memorandum*, 10.)

12      At Step Five in the sequential process, the Commissioner has the burden of demonstrating that

13  the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in

14  significant numbers in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(f).  There are

15  two ways for the Commissioner to meet this burden: (1) the testimony of a vocational expert; or (2) by

16  reference to the Medical Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, App. 2. *See Heckler v.*

17  *Campbell*, 461 U.S. 458, 461-62 (1983).  In determining whether work exists in the national economy,

18  the Social Security Administration takes "administrative notice of reliable job information available

19  from various governmental and other publications," including the DOT, published by the Department of

20  Labor.  20 C.F.R. § 404.1566; 20 C.F.R. § 416.966.  To address the problems that arise when

21  occupational evidence provided by the vocational expert is in conflict with information in the DOT, the

22  Social Security Administration issued a ruling "to clarify ... standards for identifying and resolving such

23  conflicts." *See* SSR 00-4p.  This ruling clarified that an ALJ must inquire whether a conflict exists

24  between the vocational expert's testimony and the job descriptions in the DOT, and if so, must elicit

25  sufficient support on the record from the vocational expert to justify any conflict. *Id*.

26      The vocational expert testified that based on Plaintiff's age, education, and residual functional

27  capacity, Plaintiff could not perform his past relevant work as a forklift operator, but could perform the

28  jobs of laundry laborer, counter clerk, and the general labor position of a plastic products assembler, all

07cv736

of which exist in significant numbers in the national and local economies. [AR at 482-83.] The vocational expert also provided the numbers of the descriptions of each of these jobs in the DOT when asked by the ALJ. [*Id.*] Plaintiff argues that pursuant to Social Security Ruling 00-4p, the ALJ was required to ask the vocational expert whether his testimony conflicted with the DOT. However, Plaintiff does not argue that any conflict exists, and a review of the DOT job descriptions confirms that no conflict exists. (*See Commissioner's Memorandum*, Ex. "A.") Accordingly, under controlling Ninth Circuit precedent established in *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007), which Plaintiff noticeably does not cite in his motion, the ALJ's error in this case was harmless. *See Massachi*, 486 F.3d at 1154, n. 19 (noting that failure to ask about a conflict is harmless where there is no conflict).

<h3 style="text-align:center">CONCLUSION</h3>

Based on a review of the record and consideration of the briefs submitted, finding Plaintiff's claims to be without merit, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment be **GRANTED** and Plaintiff's Amended Motion for Summary Judgment be **DENIED**.

This Report and Recommendation is submitted by the undersigned Magistrate Judge to the District Judge assigned to this case, pursuant to the provision of Title 28, United States Code, section 636(b)(1).

Any party may file written objections with the Court and serve a copy on all parties on or before *July 11, 2008*. The document should be captioned "Objections to Report and Recommendation."

**IT IS SO ORDERED**.

DATED: June 26, 2008

Hon. Nita L. Stormes
U.S. Magistrate Judge

26

07cv736